**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**DOMINICK MICHAEL SMITH,**

       **Plaintiff,**

**v.**                                  **Case No. _____**

**NEW MEXICO CORRECTIONS DEPARTMENT;**
**THE GEO GROUP, INC.; WARDEN MARK BOWEN,**
**ASST. WARDEN RONALD PETERS; LIEUTENANT**
**CHRISTINA JACKSON; CORRECTION OFFICER**
**OSORIO; DEFENDANT CORRECTIONAL OFFICER**
**HENRY J. CHANCE; SERGEANT DOE; MAJOR DOE;**
**CORRECTIONAL OFFICER DOE,**               **JURY REQUESTED**

       **Defendants.**

## COMPLAINT FOR PERSONAL INJURIES, CIVIL RIGHTS VIOLATIONS AND VIOLATIONS OF NEW MEXICO TORT CLAIMS ACT

Plaintiff, Dominick Michael Smith, by and through his attorney, (Law Office of Frances Crockett, LLC), hereby brings this complaint for personal injuries, for civil rights violations pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. § 1343 and for violations of the New Mexico Tort Claims Act, NMSA 1978 § 41-4-1, et. seq. In support of this complaint, Plaintiff states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 42 U.S.C. §§ 1983 and

1988, and 28 U.S.C. § 1343.

2.      Venue is proper in this district as Defendant The GEO Group, Inc. is a foreign corporation registered to do business, New Mexico Corrections Department is an agency of the State of New Mexico, situated in New Mexico and upon information and belief all other Defendants are residents of New Mexico.

3.      Plaintiff is a resident of Lea County, New Mexico.

4.      All acts complained of occurred in Union County, New Mexico.

## PARTIES

5.      Plaintiff, Dominick Michael Smith was an inmate at the Northeast New Mexico Detention Facility ("NENMDF") in Clayton, New Mexico, on October 29, 2020.  Plaintiff is currently incarcerated in Lea County Correctional Facility in Hobbs, Santa Rosa County, New Mexico.

6.      Defendant New Mexico Corrections Department ("NMCD") is an agency of the State of New Mexico.  At all times relevant and material herein, the NMCD contracted with the Town of Clayton and Geo Group, Inc. to house NMCD inmates at the NENMDF.  NMCD had a duty to assure that the NENMDF was adequately staffed and safe for prisoners under its care.  Its failure to assure the safety of the NENMDF violated Section 41-4-6 of the New Mexico Tort Claims Act.

7.      Defendant Geo Group, Inc. (GEO), is a Foreign Profit Corporation that operates correctional facilities in New Mexico.  At all times relevant and material herein, GEO operated, under a contract with the New Mexico Department of Corrections ("NMDC") the NENMDF and was responsible for the care and management of the inmates housed at the facility.

8.      At all times material hereto, Defendant Warden Mark Bowen (hereinafter "Defendant Bowen") was, at all times material hereto, the Chief Officer/Warden at Northeast New Mexico Detention Facility (NENMDF), in charge of its facilities and operations, including, but not limited to staffing, and was acting within the course and scope of his employment and/or agency. Bowen at all material times was a law enforcement as defined in the New Mexico Tort Claims Act, NMSA 1978 § 41-4-3(D).

9.     Assistant Warden Ronald Peters (hereinafter "Defendant Peters") was, at all times material hereto, the Assistant Warden at Northeast New Mexico Detention Facility (NENMDF), and was acting within the course and scope of his employment and/or agency. Peters at all material times was a law enforcement as defined in the New Mexico Tort Claims Act, NMSA 1978 § 41-4-3(D).

10.     Defendant Lieutenant Christina Jackson (hereinafter "Defendant Jackson") was, at all times material hereto, employed by GEO as a Lieutenant/Corrections Officer for NENMDF and was acting within the course and scope of her employment and/or agency. Jackson at all material times was a law enforcement as defined in the New Mexico Tort Claims Act, NMSA 1978 § 41-4-3(D).

11.     Defendant Correctional Officer Osorio (hereinafter "Defendant Osorio") was, at all times material hereto, employed by GEO as a Corrections Officer for NENMDF and was acting within the course and scope of his employment and/or agency. Osorio at all material times was law enforcement as defined in the New Mexico Tort Claims Act, NMSA 1978 § 41-4-3(D).

12.     Defendant Correctional Officer Henry J. Chance (hereinafter "Defendant Chance") was, at all times material hereto, employed by GEO as a Corrections Officer for NENMDF and was acting within the course and scope of his employment and/or agency. Chance at all material times was law enforcement as defined in the New Mexico Tort Claims Act, NMSA 1978 § 41-4-3(D).

13.     Defendant Major Doe was, at all times material hereto, employed by GEO as a Major/Corrections Officer for NENMDF and was acting within the course and scope of his employment and/or agency. Major Doe, at all material times was law enforcement as defined in the New Mexico Tort Claims Act, NMSA 1978 § 41-4-3(D).

14.     Defendant Sergeant Doe was, at all times material hereto, employed by GEO as a Sergeant/Corrections Officer for NENMDF and was acting within the course and scope of his employment and/or agency.  Sergeant Doe at all material times was law enforcement as defined in the New Mexico Tort Claims Act, NMSA 1978 § 41-4-3(D).

## JURISDICTION AND VENUE

15.     The acts complained of occurred in Union County, New Mexico.

16.     Plaintiff brings this complaint under NMSA 1978 § 41-4-1 through Section 41-4-30 of the New Mexico Tort Claims Act for damages arising from Defendants' negligence.  Pursuant to NMSA 1978 § 41-4-15, Plaintiff has filed his suit within two years of the date of the events leading to the injuries he suffered as a result of the actions/in-actions of Defendants.

17.     Jurisdiction and venue are proper in federal court and in New Mexico pursuant to 42 U.S.C. § 1983 and 1988 and 28 U.S.C. § 1343.  All of the parties reside in New Mexico and the acts complained of occurred exclusively within New Mexico.

18.     Jurisdiction and venue are also proper in this Court pursuant to NMSA 1978 § 38-3-1(A).

## FACTUAL BACKGROUND

19.     On October 29, 2019, Dominick Michael Smith was incarcerated at the NENMDF in Clayton, New Mexico.  At the time of the incident herein, he was in Housing 2, Delta Pod, Cell 203.

20.     Inmate Orlando Torres, a convicted murderer serving 998.7 years, was also housed in the Pod.  Mr. Torres should never have been housed in an unsecure Unit.

21.     Upon information and belief, Torres had attacked other inmates in the past.

22.     As shown on the videotape of the unit prior to Torres entering Cell #215 there was activity by the inmates, including but not limited to inmates gathering in front of Cell #215 and some are clearly blocking the entrance to the cell and appear to be "look outs".

23.     As shown on the videotape of the unit, at approximately 9:03 p.m. Inmate Orlando Torres entered Cell #215 and began attacking Michael Maes.  At least one inmate is blocking entrance to the cell. Shortly thereafter, Mr. Vigil ran out of the room, pushed the panic button and went to get Inmate Dominick Smith in his cell, telling him about the attack.

24.     Both Mr. Vigil and Mr. Smith pushed the panic button, but there was no response.

25.     Mr. Smith then ran up the stairs to Cell #215 which was being blocked by other inmates, and was able to enter in an attempt to assist Mr. Maes.  He observed Mr. Torres stabbing Mr. Maes and heard Mr. Maes yelling "He's stabbing me!" and "I'm dying!"  Mr. Smith was able to get between Mr. Torres and Mr. Maes when Mr. Torres began to attack him, stabbing him in the neck and hands.  They struggled outside the cell when Mr. Smith was able to get away and ran down the stairs to the Unit door, holding his neck which was bleeding profusely.

26.     Mr. Smith pounded on the door and window with his bloody hands until he was able to get the attention of Defendant Osorio who wrote in his Witness Statement to STIU that "Around 21:15 hours Inmate (Dominick Smith NMCD #6612) started kicking and yelling at the Delta Pod door...yelling "Open the fucking door!... I need to go to medical.  I'm fucking bleeding!" Defendant Osorio stated he could not see much from the Pickit so he turned on the camera in Delta Pod and saw Inmate Smith covered in blood.  Defendant Osorio asked Mr. Smith what happened to him to which Mr. Smith replied that he had been stabbed and smeared blood on the window as proof.  Mr. Smith recalls that Defendant Osorio told him to hold on, that he didn't "have an officer."

27.     Defendant Osorio called Master Control and spoke with Defendant Chance, informing him of the stabbing stating he was going to get the inmate out and requesting that Defendant Chance take control of Housing Two (2).  At approximately 9:11, Defendant Osorio went to the pod door and opened it, allowing Mr. Smith to enter the hallway.

28.     As Defendant Osorio was leaving Housing Two (2) to escort Mr. Smith to medical, Defendant Jackson and Sergeant Martin arrived.  CO Martin was asked to escort Mr. Smith to medical at which time Mr. Smith asked them to check Cell 215, and stated that there was another inmate that had been stabbed.

29.     Defendants Jackson and Osorio ran to Delta pod to "rack up" the inmates.  After securing the inmates, they checked Cell 215 and saw Michael Maes laying on the floor of the cell.  Lt. Jackson realized Mr. Maes wasn't breathing, called for medical and began CPR.  When medical arrived, they continued CPR, but soon Defendant Osorio heard Defendant Jackson say over the radio "There is no pulse.  Call EMS."

30.     Mr. Maes was placed on a backboard, carried down the stairs and placed on a gurney.  He was then taken to the front administration area to wait for the ambulance.

31.     EMS arrived and took over medical treatment and transported Smith and Maes to the hospital.

32.     Smith's physical injuries were a result of being stabbed in the neck and in the hands. He also suffered mental and emotional damages as a result of the incident.

33.     Major McGehee, Defendant Bowen, Defendant Peters, Assistant Warden Brown and Captain Beatty all arrived at the facility.  Warden Bowen was properly briefed and assumed command of the situation.

34.     The events leading up to the assault on Mr. Smith and Mr. Maes' murder were foreseeable and preventable.

35.     Had Defendant Osorio been observing the camera, he would have seen the suspicious movement of the inmates leading up to the attacks and would have been able to shut down the unit quickly, minimizing or even preventing the attack on Mr. Smith and murder of Michael Maes.

36.     Had NENMDF been properly staffed, and properly monitoring the inmates, this incident would have been prevented.  Mr. Smith stated that he had not seen any COs in the pod for 2 days and that it was a very dangerous environment

***The Northeast New Mexico Detention Facility***

37.     At all times material hereto, the NENMDF was operated by the GEO Group, Inc. (GEO).

38.     The State of New Mexico housed convicted prisoners in the NENMDF.

39.     GEO had operated the NENMDF since 2008.

40.     GEO designed and built the facility while the Town of Clayton paid for the prison's construction.

41.     The NENMDF has the capacity to house approximately 625 medium-security male inmates. However, upon information and belief, as of June 2019 NENMDF was asking to only house between 500 and 530, due to staffing problems. As of June, Geo Group was advertising for at least 16 positions at the prison, including corrections officers.

42.     In October of 2019, only 22 correctional officers/correctional technicians were employed at the prison, rather than the required and authorized 95.

43.     Upon information and belief at the time of the incident less than fifteen (15) people were on staff and working.

44. According to a subsequent investigation by the NMCD, on October 29, 2019, staff vacancies at the prison were "dangerously inadequate."

45. GEO has previously been assessed substantial penalties by the State of New Mexico for failure to maintain minimum staffing levels at NENMDF.

46. From 2017 to 2018, NMCD assessed against GEO more than $1,300,000 in penalties for failing to provide enough security to keep the prison safe.

47. Despite the assessments, GEO continued to understaff the prison and run the facility without adequate staffing.

48. NMCD had knowledge the prison was understaffed.

49. In June 2019, GEO announced it would not renew its contract with the State of New Mexico and the Town of Clayton to operate the facility. The company cited the difficulty it faced in keeping the NENMDF adequately staffed as its reason not to renew the contract.

50. The State of New Mexico had planned to take over operations of the prison during a three-month transitional phase that was set to begin August 3, 2019.

51. That transitional phase was extended and GEO was still operating NENMDF on October 29, 2019.

52. On October 29, 2019, NENMDF was woefully understaffed.

### *The Investigation and Aftermath*

53. New Mexico Corrections Department's STIU unit and the Clayton Police Department conducted investigations into the matter.

54. In the course of their investigation, STIU listened to recordings of all of the phone calls which had been made by various inmates, including Michael Maes and Orlando Torres.

55.     On October 4, 2019, the STIU monitored a call placed by Orlando Torres in which possible assaults and attempting to kill another inmate was discussed.  Torres also stated that he had been pulled from his cell and escorted to medical by the Sergeant and the Major (Defendants Sergeant Doe and Major Doe yet to be identified).  He stated he was asked by the Major if he (Inmate Torres) was planning on conducting an assault on someone with a weapon or killing someone, and that they had received "kites" of hurting or killing someone and he was going to be placed in segregation pending an investigation.

56.     Upon information and belief, Inmate Torres was not placed in segregation and an investigation into the allegations was ever conducted.

57.     On the morning of October 29, 2019, another inmate, Rain Aranaga, made a call to his girlfriend telling her that "something was going to happen and if it happens, he does not know when he will be able to call her again."

58.     It is clear that NENMDF had prior knowledge that an attack on an inmate was being planned and going to take place, however nothing was done to properly investigate or prevent the attacks.

### COUNT I: NEGLIGENT HIRING, SUPERVISION AND TRAINING
### (GEO GROUP)

59.     Plaintiff incorporates all preceding allegations as if fully set forth herein.

60.     In regards to the staffing and training of its correctional officers, Defendant GEO Group failed to comply with the terms of the agreement between Defendant NMCD and GEO Group to operate the NENMDF.

61.     GEO Group was negligent in its duties to provide experienced and well-trained staff to supervise inmates at the facility such as Dominick Smith.

62.     GEO Group was required under the agreement and had a duty to make sure NENMDF was properly staffed in order to supervise inmates at the facility such as Dominick Smith.

63.     This duty was owed to Dominick Smith, as well as the other inmates at the NENMDF.

64.     GEO Group breached its duty by failing to properly staff NENMDF pursuant to the agreement with NMCD.

65.     GEO Group knew, or reasonably should have known, that some harm might be caused to Plaintiff and/or other inmates due to their understaffing.

66.     GEO Group was negligent in not closely ensuring a safe and secure environment for inmates at the NENMDF.

67.     GEO Group has all the legal responsibilities associated with operating a correctional facility under New Mexico law.

68.     GEO Group's actions and inactions as set forth herein were both the cause in fact and proximate cause of Plaintiff's damages and injuries.  These damages include physical pain and suffering of Dominick Smith.

### COUNT II – NEGLIGENCE AGAINST NEW MEXICO CORRECTIONS DEPARTMENT; GEO GROUP, INC.; WARDEN MARK BOWEN; ASSISTANT WARDEN PETERS; LT. CHRISTINA JACKSON

69.     Plaintiff incorporates all preceding allegations as if fully set forth herein.

70.     Defendants NMCD and GEO Group and all named Defendants owed Plaintiff a duty to exercise ordinary care to maintain a safe, secure and adequately staffed prison.

71.     NMCD, GEO Group, Warden Mark Bowen, Assistant Warden Peters, and Lt. Christina Jackson, breached this duty by, among other things, negligently failing to provide Michael Maes with a safe housing environment, failing to ensure that the NENMDF was adequately staffed and

by housing a dangerous inmate like Orlando Torres in general population in a medium-security prison.

72. NMCD has a legal responsibility for inmates that is mandated by law.

73. As a direct and proximate result of NMCD and GEO Group's negligence, Dominick Smith was stabbed, resulting in serious injuries. Michael Maes was stabbed to death.

74. The GEO Group and the individual Defendants were indifferent to the safety of inmates and guards by constantly running a facility that was understaffed and not properly secured.

75. Likewise, the GEO Group and the individual Defendants were indifferent to the safety of inmates by failing to properly investigate and segregate any inmates who may be involved in harming another inmate.

76. The GEO Group and the individual Defendants were indifferent to the safety of inmates by failing to properly monitor the activities of the inmates.

77. This indifference and reckless disregard of the safety of inmates warrants a reward of punitive damages against each.

78. At all times the employees and agents of the Defendants were acting within the scope of their duties and the Defendants are vicariously liable for that conduct.

**COUNT III: NEGLIGENCE AGAINST MAJOR DOE AND SERGEANT DOE**

79. Plaintiff incorporates all preceding allegations as if fully set forth herein.

80. Defendants Major Doe and Sergeant Doe owed all inmates, including Plaintiff, a duty to exercise ordinary care to protect them from harm while in custody at NENMDF.

81. Defendants breached this duty by, among other things, failing to investigate the threats made by Mr. Torres, to place him in segregation, and by allowing him to remain in the open pod

with access to other inmates when they had clear knowledge of his threats to attack or kill another inmate.

82.     As a direct and proximate result of Major Doe's and Sergeant Doe's negligence, Dominick Smith was stabbed multiple times in his hands and he was stabbed in his neck, resulting in serious injuries.  Michael Maes was stabbed multiple times to death.

83.     At all times the employees and agents of the Defendants were acting within the scope of their duties and the Defendants are vicariously liable for that conduct.

## COUNT IV: SPOLIATION OF EVIDENCE AGAINST DEFENDANTS NMCD AND GEO

84.     Plaintiff incorporates all preceding allegations as if fully set forth herein.

85.     Defendants NMCD and GEO intentionally disposed of, destroyed, mutilated or significantly altered evidence relevant to this lawsuit, including videotape evidence.

86.     There was a lawsuit or the potential for a lawsuit.

87.     Defendants knew there was a lawsuit or the potential for a lawsuit.

88.     Defendants disposed of, destroyed, mutilated or significantly altered potential evidence.

89.     By their conduct, Defendants intent was to disrupt or defeat a potential lawsuit.

90.     The destruction or alteration of the evidence materially impacted Plaintiff's ability to prove portions of his case.

91.     The videotape Plaintiff has ends after 9 minutes, when Mr. Smith was shown at the door. However, the October 30, 2019, Memorandum from STIU Sergeant Garza shows a video timeline of the incident lasting approximately 23 minutes, meaning there are 14 minutes of missing video.

92.     When Plaintiff requested a full version of the videotape, as well as other videotapes which are referenced in various portions of the reports, Plaintiff was told several different stories.

First, Plaintiff was told there were no other tapes. Second, Plaintiff was told that they had been turned over to Clayton Police Department and/or the District Attorney's office. Clayton PD denied receiving them.

93.     The Memorandum from STIU was received in response to an Inspection of Public Records Act "IPRA" request to the District Attorney's office and proves that there is a complete version of the tape which at one point was reviewed by STIU. When discussed with officials of NMCD, they denied having any other tape.

94.     The State of New Mexico Incident Report No. 2019-26527 by Officer Michael Mann also references a hand-held camera being operated by Lt. Jackson before being given to him. There is no information as to what happened to that camera or the tape it contained.

95.     Sgt. Christopher Dale also reported that when he inquired about videotapes, Sgt. Garza stated they were still reviewing the video footage. When he requested to view the Pod video monitor, Sgt. Garza took him to the monitor room and he watched the video while she identified several of the inmates.

96.     Upon information and belief, when GEO left the facility, they were observed to be removing multiple boxes which, upon information and belief, contained prison records including but not limited to audios, videos, and other documents.

97.     This is contrary to the contract, which requires the Contractor to establish appropriate safeguards to protect the confidentiality of inmate records and minimize the possibility of theft, loss, or destruction. See Exhibit A, Jail Provision and Operations Agreement between The GEO Group, Inc. and The Town of Clayton, Section 9.2.1. According to NMCD, in a response to an IPRA request which they stated they could not fulfill, the facility (NENMDF) is missing hundreds, if not thousands of documents and records.

98.     It is clear that Defendants altered or destroyed documents in an effort to protect against a

potential lawsuit.

99.     Plaintiff suffered damages as a result of the destruction or alteration.

## COUNT V: BREACH OF THIRD PARTY BENEFICIARY CONTRACT CLAIM[1] AGAINST NMCD AND GEO GROUP

100.    Plaintiff incorporates all preceding allegations as if fully set forth herein.

101.    Upon information and belief, Defendant NMCD contracted with the Town of Clayton

and GEO Group to house NMCD inmates at the NENMDF.

102.    Plaintiff, as an NMCD inmate, was intended to benefit (was a third party beneficiary)

from the agreement between NMCD, the Town of Clayton, and GEO Group.

103.    The contracts between Defendant NMCD, the Town of Clayton and GEO Group stated

that GEO was Clayton's independent contractor for the provision and operation of a Jail with a

minimum of 625 beds, which Jail shall meet or exceed all applicable Standards.  "Standards" is

defined to mean all federal and state laws, codes, statutes, regulations, constitutional

requirements, court orders, applicable American Correctional Association (ACA) Standards and

all standards, policies or procedures of Clayton, C and/or SA and/or other governmental entities

that may send inmates to the Jail.

104.    The contracts mandated that the facility should be operated, maintained and managed in

compliance with all applicable federal and state constitutional requirements and laws.

Additionally, the contracts required that the Contractor (GEO) shall at all times provide adequate

staffing of the Jail in compliance with all applicable Standards, and that Contractor shall at all

times staff all essential employee positions in strict accordance with the schedules on the staffing

---

[1] Plaintiff has attached the portions of the Contract that he is in possession of at the time of the filing of this Complaint.

pattern.  The Contracts also specified that "if a position remains vacant for more than 30 days", the Contractor would be penalized.  The Contractor was required to report to Clayton monthly in arrears the number of authorized positions, the number of staffed positions, and the number of vacant positions at the Jail.  See Exhibit A, Jail Provision and Operations Agreement between The GEO Group, Inc. and The Town of Clayton, and Exhibit B, Agreement Between New Mexico Corrections Department and Clayton, New Mexico,.

105.    The Contract also required that the Contractor (GEO) shall provide to the Clayton jail monitor an immediate verbal report of serious incidents and serious staff misconduct followed by a written report no later than three working days following the incident.  It further states that the Contractor shall comply with C and/or SA's serious incident and serious staff misconduct reporting policy.

106.    The contract required the Contractor to impose discipline through rules, regulations, and orders pursuant to a disciplinary system meeting or exceeding standards imposed by all applicable Standards and court orders and shall provide an inmate grievance procedure that meets or exceeds Standards and court orders.

107.    The contract required that there should be a Jail Administrator of the Jail approved by Clayton.  The Contractor shall provide a written policy and procedures manual and preliminary post orders for operation of the Jail for all inmates, which shall meet the requirements of all applicable Standards and which shall include procedures for all operational activities as well as emergencies and special or unusual situations.

108.    Further, all security posts shall have a post order which has been approved in writing by Clayton.  Post Orders shall contain sufficient detail to insure the security staff member filling the position can accomplish all required tasks.  A written record shall be maintained which contains

acknowledgment in the form of an employee's signature indicating that each person assigned to a security position or post has reviewed the post order and understood the contents therein.

109.     The contract also specifies that the Contractor shall keep proper and complete books, records, and accounts with respect to the jail and permit Clayton and any C and/or SA to inspect the same and make and take away copies thereof.

110.     The contract continues that Clayton shall engage a Jail Monitor for the monitoring of Clayton inmates housed at the Jail who shall work for and be paid by Clayton.  The Jail Monitor shall be the official liaison between Clayton and Contractor on all matters pertaining to the Agreement and the management and operation services provided thereunder.  The Contractor also agrees to develop and submit to Clayton for approval a detailed plan illustrating how Contractor intends to monitor operations of the Jail to ensure compliance with the agreement. The Jail Monitor shall devise a checklist for monitoring the quality of Contractor's performance and the Contractor shall cooperate fully in obtaining the requisite information needed to complete such checklists and to assess the quality of Contractor performance.

111.     The Contractor shall indemnify and hold Clayton harmless from and against, and shall defend Clayton against any and all losses, damages, claims, costs, penalties, liabilities, and expenses.

112.     Defendants executed multiple contract extensions following the initial contract, culminating in an Amendment to the contract in June of 2019, with a 90-day extension until termination as it was determined GEO could not adhere to the terms of the contract, especially with regard to staffing.  This Amendment itself, breached the contracts in place in that it stipulated to deleting Section 4.4.1, Vacancies, at GEO's request, and as approved by the State of New Mexico, thereby allowing that GEO to have no penalties assessed due to vacancy during the

extension. See Exhibit C, Fifth Amendment to the Jail Provision and Operations Agreement between Clayton, New Mexico and GEO Corrections and Detention, LLC.

113. Defendants NMCD and GEO Group allowed a breach of the agreement to occur by not enforcing their contractual rights sufficiently and/or by violating the terms of those contracts.

114. This breach of contract resulted in the stabbing of Dominick Smith and the serious injuries he sustained. It also resulted in Michael Maes being stabbed to death. Both of these were foreseeable as a result of the breaches as set forth herein.

## COUNT VI: NMSA 1978, § 41-4-6 – ALL NAMED DEFENDANTS

115. Plaintiff incorporates all preceding allegations as if fully set forth herein.

116. The relevant portion of Section 41–4–6 waives immunity for "liability for damages resulting from bodily injury, wrongful death, or property damage caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings."

117. Defendants were tasked to provide, in part, safety to all inmates housed at NENMDF and owed a duty to operate the NENMDF with appropriate policies, procedures and systems so that foreseeable dangerous conditions such as the ones stated herein are not created.

118. As set forth herein, Defendants were negligent in their operation of the NENMDF when they failed to ensure enough staff were on duty at all times, to ensure all staff were properly trained and adhered to the policies and procedures and training, and to honor the terms of the contract with the NMDC to ensure the aforementioned, which were contracted terms, were followed. Defendants were also negligent, as set forth herein, by having guards who were supposed to be monitoring the cameras perform other tasks which caused them to take their attention away from monitoring the cameras. Defendants were also negligent, as set forth herein,

by not putting inmate Torres in segregation and performing a through investigation of the facts and information they had which should have informed them that an attack on an inmate was going to occur on the day it occurred.

119.    The Defendants negligently operated NENMDF, in addition to what has been set forth herein, whether as a result of understaffing or improper or the failure to have the proper policies, procedures and protocols in place to address dangerous conditions as set forth herein.

120.    Dominick Smith was an inmate housed at NENMDF and was within the class of persons who could reasonably be expected to be injured as a result of the negligence in the operation of the NENMDF.

121.    Had Defendants operated the facility with proper staffing and followed proper policy and procedure and in the ways as set forth herein, the incident as set forth herein would not have occurred.

122.    As a direct result of the Defendants negligence, Dominic Smith, Michael Maes and other inmates were placed in harm's way and suffered an attack that was known to Defendants weeks prior to the attack.

123.    At all times the employees and agents of the Defendants were acting within the scope of their duties and the Defendants are vicariously liable for that conduct.

**COUNT VII - VIOLATION OF THE EIGHTH AMENDMENT OF THE UNITED STATES CONSTITUTION PURSUANT TO 42 U.S.C. § 1983 (INDIVIDUALLY NAMED DEFENDANTS)**

124.    Plaintiff incorporates by reference the preceding paragraphs as though they were stated fully herein.

125.     The constitutional protection against cruel and unusual punishment for pretrial detainees applies through the due process clause of the Fourteenth Amendment.

126. The constitutional protection against cruel and unusual punishment for people who have been convicted of crimes applies through the Eighth Amendment and applies to the states via the Fourteenth Amendment.

127. Plaintiff's Eighth Amendment rights were violated by the individually named Defendants when they failed to protect him from violence at the hands of inmate Torres and other inmates at NENMDF.

128. The individually named Defendants knew inmate Torres had been involved in at least one fight with another inmate in the past and likewise as set forth herein they knew that inmate Torres was, at least by October 4, 2019, planning an attack on a fellow inmate.

129. On the day of the attack and as set forth herein, it was obvious that something was awry given the inmates gathering next to Michael Maes' cell prior to the attack on him and subsequent attack on Dominick Smith. Despite this, no guards entered the pod or did anything to investigate and stop the attack as set forth herein.

130. None of these Defendants followed policy that required them to remove Torres from the housing unit and place him in segregation and do a full and complete investigation regarding the planned attack.

131. Despite the call the morning of the attack and as set forth herein, none of these Defendants ensured proper security of the pod that day and in fact ran the prison understaffed and undermanned leaving the inmates in the pod without adequate security.

132. The higher level Defendants did not order any corrections officer(s) be posted in the housing unit despite the facts as set forth herein and despite the fact that there had been unusual movement in the housing unit prior to the attack and that the inmates had not been acting like themselves and had been on edge.

133.    These Defendants were all aware of the unreasonably dangerous conditions in the housing unit and the dangers to the inmates, including Smith and Maes, knew these conditions posed a serious risk to inmates, including Smith and Maes, and acted with deliberate indifference to Mr. Smith's safety.

134.    As a result of this deliberate indifference to the known risks to Mr. Smith, he was attacked and severely injured by inmate Torres.

135.    Defendants acted with a callous disregard and with deliberate indifference to Mr. Smith's safety.

**COUNT VIII -VIOLATION OF THE EIGHTH AMENDMENT OF THE UNITED STATES CONSTITUTION PURSUANT TO 42 U.S.C. § 1983 - (WARDENS BOWEN AND PETERS AND LIEUTENANT JACKSON)**

136.    Plaintiff incorporates by reference the preceding paragraphs as though they were stated fully herein.

137.    Plaintiff's Eighth Amendment rights were violated by Defendants when they failed to protect him from violence at the hands of other inmates at NENMDF.

138.    Defendants were responsible for operating a prison that protects inmates from known dangers to inmates.

139.    Defendant Wardens and Defendants who were acting as Chief of Security, knew that failing to remove an inmate who had been planning to injure and possibly kill an inmate from a housing unit was unreasonably dangerous and they knew that they had a policy requiring removal and segregation for inmates who were suspected of fighting or planning to attack or kill anyone to prevent the dangers posed by permitting these inmates to remain in the housing unit.

140.    Despite this known danger, these Defendants failed to enforce their policies including but not limited to removing inmates who may be involved in an attack and placing them in segregation.

141.    Upon information and belief, these Defendants also failed to train staff on their policies causing dangerous conditions within NENMDF.

142.    These Defendants were also aware that they needed adequate staffing in the prison to ensure that the inmates were properly supervised to prevent them from harming each other. Despite this knowledge, they failed to ensure that there was adequate staffing to supervise inmates at NENMDF to prevent them from harming each other.

143.    These Defendants knew that when dangerous conditions existed in a housing unit, they must increase supervision in this housing unit to ensure the safety of the inmates.

144.    Upon information and belief, despite this knowledge, these Defendants did not promulgate or enforce policies, procedures, or provide training necessary to ensure that supervision was increased when there was trouble in a housing unit.

145.    These Defendants knew that corrections officers monitoring cameras in the housing units must focus on monitoring the housing units for dangerous conditions.

146.    Despite this knowledge and upon information and belief, these Defendants allowed the officers monitoring the cameras to also answer phone calls, schedule visitations, and do other tasks which diverted their attention from the cameras they were supposed to be monitoring.

147.    These Defendants knew that inmates with a history of assaulting other inmates posed a danger to the other inmates with whom they were housed.

148.	Despite this knowledge, these Defendants failed to promulgate or enforce policies, procedures, or provide training necessary to ensure that dangerous inmates were kept away from other inmates.

149.	These Defendants and the above-listed failures caused unreasonably dangerous conditions in the jail and to Mr. Smith and Mr. Maes, they knew these conditions posed a serious risk to the inmates in the jail, including Mr. Smith and Mr. Maes, and they acted with deliberate indifference to the inmates' safety.

150.	As a result of this deliberate indifference to the known risks to inmates at NENMDF, including Mr. Smith and Mr. Maes, both Smith and Maes were attacked and stabbed by inmate Torres resulting in serious injuries to Mr. Smith and death to Mr. Maes.

151.	Defendants acted with a callous disregard and with deliberate indifference to the safety of the inmates at NENMDF including Mr. Maes and Smith.

**COUNT IX - VIOLATION OF THE EIGHTH AMENDMENT OF THE UNITED STATES CONSTITUTION PURSUANT TO 42 U.S.C. § 1983 (GOVERNMENT LIABILITY OF NENMDF)**

152.	Plaintiff incorporates by reference the preceding paragraphs as though they were stated fully herein.

153.	Plaintiff's Eighth Amendment rights were violated by Defendants when they failed to protect him from violence at the hands of other inmates at NENMDF.

154.	Clayton, NMCD, and GEO were responsible for operating a jail that protects inmates from known dangers to inmates.

155.	NMCD and GEO had a policy requiring removal and segregation for inmates who had been fighting or were planning an attack to prevent the dangers posed by permitting these inmates to remain in the housing unit.

156.    NMCD and GEO had a policy, practice, and custom of failing to enforce their policies, including requiring inmates who they suspected may be subject to an attack or who may attack another inmate to be removed from the housing unit and placed in segregation pending a thorough investigation.

157.    Upon information and belief, NMCD and GEO also had a policy, practice, and custom of failing to train staff on their policies which caused dangerous conditions within NENMDF.

158.    The County, GEO, and NMCD had a policy, practice, and custom of failing to ensure that there was adequate staffing to supervise inmates at NENMDF to prevent them from harming each other.

159.    Upon information and belief, Clayton, GEO and NMCD did not have sufficient policies, procedures, or provide training necessary to ensure that supervision was increased when there was trouble in a housing unit.

160.    Clayton, GEO, and NMCD had policies, practices, and customs of allowing the officers monitoring the cameras to also answer phone calls, schedule visitations, and perform other tasks when they should have been focused on monitoring the housing units.

161.    Clayton, GEO, and NMCD did not have sufficient policies, procedures, or provide training necessary to ensure that dangerous inmates were kept away from other inmates.

162.    Clayton, GEO, and NMCD's policies, practices, and customs, and lack of sufficient policies, procedures and training caused unreasonably dangerous conditions in the prison and to Mr. Maes and constitute deliberate indifference to the inmates' safety.

163.    Upon information and belief, NMCD and GEO failed to adequately supervise their employees causing unreasonably dangerous conditions in the prison and to Mr. Smith and constitute deliberate indifference to the inmates' safety.

164.    Upon information and belief, NMCD and GEO hired and promoted and retained employees who were not qualified to perform their jobs causing unreasonably dangerous conditions in the prison and to Mr. Smith and constitute deliberate indifference to the inmates' safety.

165.    As a result of this deliberate indifference to the known risks to inmates and the safety of the inmates at NENMDF, including Mr. Smith who was attacked and severely wounded, and Mr. Maes, who was attacked and killed by inmate Torres.

**COUNT X - LIABILITY OF LAW ENFORCEMENT OFFICERS IN VIOLATION OF THE NEW MEXICO TORT CLAIMS ACT, NMSA 1978 § 41-4-1 ET. SEQ. (ALL DEFENDANTS)**

166.    Plaintiff incorporates by reference the preceding paragraphs as though they were stated fully herein.

167.    At all times material to this Complaint, Defendants were law enforcement officers pursuant to the New Mexico Tort Claims Act.

168.    At all times material to this Complaint, Defendants were acting within the scope of their duties.

169.    Defendants caused Smith's assault and battery by failing to remove and segregate Torres or Smith per policy after they had facts and information that an attack on an inmate was going to occur.

170.    Defendants caused Plaintiff's assault and battery by failing to adequately staff the facility.

171.    Defendants caused Plaintiff's assault and battery by failing to increase supervision or post a corrections officer in Mr. Smith's housing unit after they had the aforementioned information from not only a few weeks prior but on the day in question and despite the fact they saw or

should have seen other inmates gathering outside of Mr. Maes' cell and they had observed unusual behavior and high tension in the housing unit prior to Mr. Smith being attacked and severely wounded and Mr. Maes was killed.

172.    Defendants caused Smith's assault and battery by allowing inmates who had a history of assaulting other inmates to be housed with other inmates despite the danger they posed to the other inmates.

173.    Defendants caused Plaintiff's assault and battery by allowing the corrections officers who monitored the cameras in the housing units to answer telephone calls and schedule visitations and perform other tasks when they should have been focusing on monitoring the housing units.

174.    As a direct and proximate results of Defendants' negligence, Plaintiff was attacked and severely wounded.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff, respectfully requests that the Court enter judgment in his favor, including:

1.    Awarding damages in an amount the jury deems sufficient to compensate Plaintiff for the nature, extent, and duration of his physical and mental injuries;

2.    Awarding damages in an amount a jury deems sufficient to compensate Plaintiff for Defendants' unlawful conduct;

3.    Punitive damages in an amount a jury deems sufficient to deter Defendants and other  prisons and prison employees from acting with deliberate indifference to the rights and safety of Smith and others;

4.    Awarding reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1983 and 1988;

5.         Awarding pre-and post-judgment interest; and

6.         For such other and further relief as the Court deems just.

**JURY DEMAND**

Plaintiff respectfully demands a jury on all issues so triable.

        Respectfully submitted,

        LAW OFFICE OF FRANCES CROCKETT, LLC

        */s/ Frances Carpenter*
        Frances Carpenter
        925 Luna Circle NW
        Albuquerque, NM 87102
        Phone: 505.314.8884; Fax: 505.835.5658
        *Attorneys for Plaintiff*